**FILED**

FEB 2 6 2008

NF

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) **08CR 0180** |
| v. | ) |
| | ) Violation: Title 18, United States Code, |
| ANTHONY F. CRISSIE | ) Section 1341 |
| | ) |
| | ) JUDGE ANDERSEN |
| | ) |

MAGISTRATE JUDGE COLE

COUNT ONE

The SPECIAL FEBRUARY 2008-1 GRAND JURY charges:

1.     At times material to this indictment:

a.     JAM Productions, Ltd. ("JAM"), was a business located in Chicago, Illinois, that performed production services of live entertainment, including concerts and special events.

b.     ANTHONY F. CRISSIE was employed by JAM as a "Talent Buyer." As a Talent Buyer for JAM, ANTHONY F. CRISSIE was responsible for booking talent and "covering" live-entertainment shows.

c.     Covering a live-entertainment show involved appearing at the show in order to handle the closing-out at the end of each show. Closing-out the show involved, among other things, handling the bookkeeping, and paying various bills incurred as a result of the show, including settling with the talent that performed during the show.

-1-

d.    Before each of the live entertainment shows, ANTHONY F. CRISSIE was required to pick-up a "Show Folder" from JAM's Contracts Department in order to perform his closing-out duties. The Show Folder contained, among other things, contracts, blank checks, blank receipts, and a list of expenses incurred for the show, for example, the cost of the talent and advertising costs.

e.    JAM's Show Folder also contained a "Talent Contract." The Talent Contract stated the terms of the business relationship between JAM and the performer in question. Specifically, the face sheet of the Talent Contract indicated whether JAM or the performer would be responsible for payment of certain show expenses.

f.    ANTHONY F. CRISSIE paid the various show expenses for which JAM was responsible with either the blank JAM checks that were provided in the Show Folder or with cash. When ANTHONY F. CRISSIE paid these expenses in cash, he obtained the cash from one of, or a combination of, three sources:  (a) a cash advance from JAM; (b) a cash advance from the show venue; or, (c) by "buying" cash from another show. "Buying" cash from another show involved the transfer of cash advance money from one show to another show via the writing of a JAM check.

g.    JAM's Show Folder also contained a "Box Office Statement." Among other things, ANTHONY F. CRISSIE was required by JAM to complete the information called for in the Box Office Statement concerning the amount of monies paid to close-out a show.

2.      From in or about late August 2002, and continuing through in or about late August 2003, in the Northern District of Illinois, Eastern Division, and elsewhere,

ANTHONY F. CRISSIE,

defendant herein, did knowingly devise and participate in a scheme to defraud JAM of money and property and to obtain and retain money and property from JAM by means of materially false and fraudulent pretenses, representations and promises, which scheme is further described below:

3.      It was part of the scheme that ANTHONY F. CRISSIE obtained monies, often cash advances, from JAM to close-out and otherwise pay expenses relating to various shows at which ANTHONY F. CRISSIE was assigned to work as a Talent Buyer. Rather than using these monies to pay legitimate close-out expenses, ANTHONY F. CRISSIE, without the knowledge or approval of JAM, used some of the monies for his own personal benefit.

4.      It was further part of the scheme that ANTHONY F. CRISSIE prepared and submitted to JAM fraudulent Box Office Statement paperwork to carry out this scheme. For example, ANTHONY F. CRISSIE would, on occasion, create two separate Box Office Statements for a particular show. ANTHONY F. CRISSIE would submit an accurate Box Office Statement to JAM's Contracts Department because ANTHONY F. CRISSIE knew that as part of JAM's ordinary course of business, JAM's Contracts Department would be able to confirm the performer payments with the performer's agent. Rather than submitting an identical copy of the accurate Box Office Statement to JAM's Accounting Department,

which ANTHONY F. CRISSIE was required to do, ANTHONY F. CRISSIE submitted a false and fraudulent Box Office Statement to JAM's Accounting Department. ANTHONY F. CRISSIE prepared and submitted, and caused to be submitted to JAM's Accounting Department, this second, fraudulent Box Office Statement to make it appear that all the monies he had received from JAM to pay close-out expenses had been used for a legitimate purpose, well knowing at the time that he had diverted some of the money to his own personal use and benefit.

5.    It was further part of the scheme that ANTHONY F. CRISSIE attempted to conceal the fraudulently inflated amounts on the Box Office Statements from JAM by removing the face sheet of the Talent Contract from the Show Folder, knowing that JAM's Accounting Department would have otherwise discovered the scheme when comparing the face sheet of the Talent Contract to the falsified copy of the Box Office Statement that ANTHONY F. CRISSIE submitted to JAM's Accounting Department.

6.    It was further part of the scheme that at times when ANTHONY F. CRISSIE was not personally present to cover a particular show, ANTHONY F. CRISSIE sent the Show Folder for that particular show to another individual ("Individual A") to cover and close-out that show in ANTHONY F. CRISSIE's place.

7.    It was further part of the scheme that at times when ANTHONY F. CRISSIE received a completed Show Folder from Individual A for a show that ANTHONY F. CRISSIE did not personally attend, ANTHONY F. CRISSIE used the Show Folder, and the

documents therein, to create a Box Office Statement that fraudulently inflated the amounts of monies paid to close-out the show.  Thereafter, ANTHONY F. CRISSIE submitted and caused to be submitted a fraudulent Box Office Statement to JAM's Accounting Department.

8.    It was further part of the scheme that, by the above means, ANTHONY F. CRISSIE obtained and retained approximately $315,944 in JAM funds which were not for legitimate show expenses and to which ANTHONY F. CRISSIE was not entitled.

9.    It was further part of the scheme that ANTHONY F. CRISSIE converted the $315,944 for his own use and benefit.

10.    It was further part of the scheme that ANTHONY F. CRISSIE did misrepresent, conceal, hide, and cause to be misrepresented, concealed and hidden, the purposes of and acts done in furtherance of the scheme.

11.    On or about February 27, 2003, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division,

ANTHONY F. CRISSIE,

defendant herein, for the purpose of executing the above-described scheme, and attempting to do so, deposited and caused to be deposited matter to be sent by a private and commercial interstate carrier, namely, UPS, a package (UPS shipping #1Z6246342210020404) containing a Show Folder for a show that was to occur on February 28, 2003, which package was addressed to Individual A, on Morrison Street, in Madison, Wisconsin;

In violation of Title 18, United States Code, Section 1341.

## FORFEITURE ALLEGATION

The SPECIAL FEBRUARY 2008-1 GRAND JURY charges:

1.      The allegation contained in Count One of this Indictment are realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      As a result of his violation of Title 18, United States Code, Sections 1341, as alleged in the foregoing Indictment,

### ANTHONY F. CRISSIE,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all right, title and interest in property, real and personal, which constitutes and is derived from proceeds traceable to the charged offense.

3.      The property of the defendant subject to forfeiture pursuant to Title 18, United States Code, Section, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) is approximately $315,944.06.

4.      If any of the property subject to forfeiture and described above, as a result of any act or omission of the defendant:

> (a)      Cannot be located upon the exercise of due diligence;

> (b)      Has been transferred or sold to, or deposited with,
>
> a third party;

> (c)      Has been placed beyond the jurisdiction of the Court;

> (d)      Has been substantially diminished in value; or

(e)     Has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions

of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code,

Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

Code, Section 2461(c).

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY